LOTTIE LENN *vs.* LOUIS R. J. RICHÉ, administrator.

Suffolk. October 9, 1953. — February 1, 1954.

Present: QUA, C.J., LUMMUS, RONAN, SPALDING, & WILLIAMS, JJ.

*Contract,* What constitutes, Performance and breach. *Loan. Frauds, Statute of. Force Majeure. Conflict of Laws. Evidence,* Presumptions and burden of proof. *Executor and Administrator,* Ancillary administration, Nonresident decedent, Claim against estate, Contract of decedent.

Evidence that a valuable painting and a number of medallions were delivered by their owner to her uncle in France, where he lived, pursuant to an agreement made between them there that he should have the use and enjoyment of the articles and should safeguard them and return them to her on her request warranted a finding that the transaction by French law was a "loan for use." [109–110]

A "loan for use" of articles entered into under French law and requiring the borrower to return the articles to the lender upon request imposed on the borrower a contractual obligation for breach of which the proper remedy in Massachusetts was an action of contract. [110]

In an action to recover for the loss of a painting and medallions having a value in excess of five thousand francs which the plaintiff delivered to her uncle in France upon his oral agreement to return them to her upon request, evidence warranted a finding that there existed such an intimate relationship between the plaintiff and her uncle that her

obtaining from him a written instrument containing his agreement was a "moral impossibility," recognized by French law as an exception to the general rule of that law that such an agreement to be binding must be contained in a written instrument. [110–111]

In an action brought in Massachusetts in which the substantive rights of the parties under a contract were to be determined by the law of France and in which the defendant raised the issue of force majeure as an excuse for nonperformance of the contract, the burden of proof on that issue was governed by Massachusetts law and was on the defendant. [111]

In an action by a lender of a painting and medallions for breach of the obligation of the borrower to return them to the plaintiff pursuant to a "loan for use" agreement made by the plaintiff and the borrower in France, under which the articles were kept by the borrower in his apartment in Paris, France, until shortly before the German occupation of France during World War II, evidence as to subsequent events during the period of occupation and thereafter did not require a finding that the defendant had sustained the burden of proving the defence set up by him that force majeure excused performance of the borrower's obligation. [111–112]

A resident of Massachusetts having a claim for breach of an obligation owed to her by one who died a resident of France leaving a will duly established there in which he made his wife his "universal legatee," succeeding to all his property and personally chargeable with his obligations, was entitled to secure payment of such claim from Massachusetts assets of the decedent by an action in Massachusetts against an ancillary administrator with the will annexed appointed here, even if an action on the claim brought in France would have had to be brought against the "universal legatee" personally. [112]

A lender of property, to whom under the law of France, where the loan agreement was made, the borrower owed an obligation to return the property on request, was entitled, after the death of the borrower resident in France, to make such a request there to a "universal legatee" succeeding to all the borrower's property, and was not required to make the request to one later appointed in Massachusetts ancillary administrator with the will annexed, in order to maintain an action against the ancillary administrator here to secure payment of a claim for breach of such obligation from the Massachusetts assets. [113]

CONTRACT OR TORT.   Writ in the Superior Court dated August 17, 1948.

The action was tried before *Goldberg, J.*

*Gardner W. Russell,* (*Lewis M. Stillman* with him,) for the defendant.

*Thomas D. Burns & Lee M. Friedman,* (*Samuel Adams, 2d,* with them,) for the plaintiff.

QUA, C.J.   This action, originally in contract or tort, is now prosecuted only on the first count, which we construe as a count in contract.   Its object is to recover for the loss of a painting called "Madonna with the Christ Child and Little St. John" by Piero Di Cosimo (1462–1519 [1521?]) and for the loss of a number of Renaissance medallions, all of which the plaintiff claims were her property.   The plaintiff is now a resident of this Commonwealth.   The defendant is the ancillary administrator with the will annexed appointed here of the estate of Paul B. Bonn, who died in 1941 a resident of Perpignan in southern France, leaving property in this Commonwealth.   The jury returned a substantial verdict for the plaintiff.   The case is here on the defendant's exceptions to the denial of his motion for a directed verdict and to the denial of his motion for a new trial.

There was evidence from which the jury could find the following facts:  The plaintiff is a student and teacher of art and a writer upon art subjects.  She was born in Frankfurt am Main, Germany, in 1903 and for many years studied and worked in Germany and Italy.  The deceased Paul B. Bonn was the uncle of the plaintiff.  The evidence tends to show that he was a man of considerable wealth and position. He studied law in Berlin and later returned to Frankfurt, where the family home was located, and was assistant manager of the Deutsche Bank there.  Later still he went back to Berlin and there became a director and chairman of the board of the same bank.  He made frequent visits to Frankfurt, where the plaintiff lived.  He acquired a substantial collection of paintings by old masters and of other objects of art.  There was a close friendship between Bonn and the plaintiff.  She visited him from time to time.  He treated her like a daughter, especially after her stepfather died in 1927.  Bonn gave her gifts of money and of small art objects.  Outside of the daily necessities of living, he provided her with "everything that made life pleasant," including the means for travel.  In 1930, after Bonn retired from the Deutsche Bank, he told the plaintiff that he was going away on a trip for about a year and afterwards

was going to live in Paris; that he wanted to leave her security, but as the times were insecure, he would leave it to her, not in money, but in valuables that would not change. Thereafter he brought the painting and the medallions to Frankfurt and delivered them to her and she kept them and stored them in a vault in Frankfurt.

In the spring of 1931 Bonn, then about fifty years of age, married, and after his return from his travels lived with his wife, who is now the wife of the defendant, in a large apartment in Paris. From time to time the plaintiff visited him there. When she was away they wrote each other at least twice a week. In the fall of 1935, on the occasion of a "family reunion" in Paris, Bonn said to the plaintiff that he thought the painting was not safe in Germany where it then was, and would not be safe in Italy, where the plaintiff was then living. He said that she should send it to him in Paris, where he could display it in his apartment and have the use and enjoyment of it and safeguard it for her until she settled somewhere and wanted it back. The plaintiff agreed to this and that he should display and safeguard the painting until she wanted it back and that he should return it upon her request. The agreement also included the medallions. Thereafter the plaintiff sent the painting and medallions to Bonn at Paris, where Bonn displayed them in his apartment with his own collection. Early in 1939 the plaintiff left Italy and went to live in Paris near Bonn's apartment. In April or May, 1940, as the result of the dropping of some bombs on Paris, Bonn told the plaintiff that he wanted to place some of his most precious paintings in a steel vault in the so called Krueger Bank and asked the plaintiff's permission to place her painting and medallions with them, to be returned to her "whenever she asked for them, whenever she arrived in the United States." Later he told her that he had done this. About this time the plaintiff, being a German citizen, was imprisoned in a concentration camp by the French, and when she was released "the entire city of Paris had changed and everybody was just on the way out." Bonn had gone. She never saw him

again. She made her way to the United States through Portugal.

There was additional evidence that Bonn did deposit paintings and engravings at the Krueger Bank about April 30, 1940, and that none of these was seized or requisitioned by the Germans; but that everything left in the apartment was taken by them in June, 1942; and that Bonn was of Jewish extraction and therefore feared the Germans, both for himself and for his property. Upon his death in 1941 he left a will, which was duly "allowed" according to the law of France, in which he named his wife as his "universal legatee." In 1945, after the war, the plaintiff requested Mrs. Riché to return her property.

The only evidence as to what became of the articles stored at the Krueger Bank is contained in the testimony of the defendant and in a deposition by his wife, formerly Bonn's widow. Briefly stated, this evidence was that in July, 1942, the defendant, armed with a power of attorney to act in behalf of the then Mrs. Bonn, succeeded in passing from Perpignan through the demarcation line into occupied France and reached Paris; that he found the Krueger Bank "full of German military police," whom he carefully avoided, as he had no pass to be in Paris; that the manager at the Krueger Bank told him that the building would be taken over by the Germans and that he wanted to get rid of Bonn's property as quickly as possible, as he was afraid he might be accused of hiding Jewish property; that the defendant had it removed by a packer who sent his truck for it; that the Germans did not interfere; that it is possible he took something from the Krueger vault to his hotel and then to the packer's; that the paintings were packed in boxes and were shipped by rail to the defendant at Marseilles; that when they arrived they were all marked as having been opened by the German control authority, and one of the boxes was half empty and another practically empty; that there were left nine or ten paintings and some of the engravings and medallions which he had removed from the vault but did not take from Paris; that he took

the medallions to a room his mother had in Paris and got them back after the war; that when he shipped the paintings by rail he knew that the railroad would assume no responsibility for them and knew that a good many things had disappeared on trains; that the boxes were sent by truck from Marseilles to Perpignan, a distance of 250 to 270 miles and were put in the baggage room of the hotel until they could make arrangements for storage in a bank; that eight or nine paintings were missing; that he made no claim for the loss because it was useless; that he did not look in the vault or at the packer's to see what went into the boxes, though he counted the paintings, which were wrapped in cloth or paper, and none was then missing; that the paintings stayed for several years in the vault at Perpignan and then were kept in a hotel room in Nice, where the defendant and his wife lived until they left for Tenerife in the Canary Islands, where they now live; that Mrs. Riché sold some of the paintings between 1948 and 1951; that they still have the others at Tenerife; and that "some of Paul Bonn's paintings . . . were turned up after the war."

Since the plaintiff's substantive rights arose in France, it becomes necessary to consider the French law. We undertake this with diffidence, especially as we have not had the benefit of the considered opinion of any French lawyer upon the particular facts of this case but have been obliged to come to our conclusions solely by taking judicial notice of the provisions of the French code, of statements by French legal writers, and of the decisions of French courts which have been submitted by the parties under G. L. (Ter. Ed.) c. 233, § 70. In dealing in this manner with foreign law with which we are unfamiliar there is always the possibility that something that might affect the result has not come to our attention or that we have failed properly to correlate the material supplied.

It is not seriously contended that the evidence would not warrant a finding that in or about 1930 Bonn made a completed gift to the plaintiff of the painting and medallions. We think the evidence would warrant the further finding

that in 1935 the plaintiff returned the articles to Bonn in Paris on what in French law is called a loan for use or commodatum. French Civil Code, Cachard (Rev. ed.) arts. 1875–1891. Under this form of loan the obligations of the borrower to preserve the thing lent and to return it according to the terms of the lending appear to us to be promissory or contractual in nature. In art. 1875 such a loan is spoken of as a contract. Under art. 1879 it extends to the heirs of the borrower. We think that under our law an action in contract is the proper remedy for breach of the obligation of the borrower to return the thing borrowed.

The defendant contends that there was no binding contract because the French law requires an instrument drawn up in the presence of notaries or made under private signature in all matters when a sum or value exceeds five thousand francs. The plaintiff concedes that this is the general rule. The parties stipulate that the alleged agreement was entirely oral and that the value of the plaintiff's property exceeded five thousand francs. We assume, as the defendant contends, that the requirement of a written instrument in the French law is not merely a matter of proof but enters into the substance of the contract. The plaintiff, however, directs our attention to an exception to the requirement of a written instrument whenever it has not been possible for the creditor to procure written proof of the obligation. French Civil Code, Cachard (Rev. ed.) art. 1348. In this article several instances of such impossibility are stated, but the plaintiff cites many French legal writers and many decisions of French courts tending to show that these instances are merely illustrative and not exclusive and that the impossibility need not be an absolute physical one but may be a so called moral impossibility. It would seem that a moral impossibility exists whenever it would be inconsistent with established custom or social convention or even good manners or when it would be seriously embarrassing to ask for an instrument in writing. The existence of a close and intimate relationship such as that of husband and wife, parent and child, master and servant, physician and patient,

has been taken into account in determining whether it was morally impossible to obtain an instrument in writing. In view of the seeming great liberality of the French law in discovering moral impossibility, we think that the jury could find the existence of such an intimate relationship between Bonn and the plaintiff that she could not reasonably be expected to insist upon obtaining a legal document from him when he offered to receive and care for her property, and that a practical or moral impossibility existed.

The defendant contends that performance of Bonn's obligation was excused by force majeure. He cites art. 1148 of the civil code which provides in substance that no damages shall be due when the debtor has been prevented from giving or doing what he had bound himself to do, owing to superior force or an inevitable event. This defence is akin to the defence of impossibility of performance under our law, where the burden of proof is upon the defendant. *New Haven & Northampton Co.* v. *Hayden,* 107 Mass. 525, 531. Williston on Contracts (Rev. ed.) § 1937. Since the case was tried here, our law governs the burden of proof. *Murphy* v. *Smith,* 307 Mass. 64, 66. *Gregory* v. *Maine Central Railroad,* 317 Mass. 636, 639–640. Restatement: Conflict of Laws, § 595. The burden would seem to be the same under French law. French Civil Code, Cachard (Rev. ed.) art. 1302. There may have been evidence of force majeure, but at most the issue was for the jury. The plaintiff's testimony leaves her property in the vault in the Krueger Bank. It could be found that nothing in the vault had been disturbed until the defendant as the agent of the then Mrs. Bonn went to the vault. What happened after that depends entirely upon the testimony of the defendant and a deposition of his wife, the former Mrs. Bonn. The jury were not obliged to believe any of this evidence, whoever introduced it, and even though it was wholly uncontradicted. *Sluskonis* v. *Boston & Maine Railroad,* 299 Mass. 413, 415–416. *Perry* v. *Hanover,* 314 Mass. 167, 170. If they believed that the paintings were sent across the demarcation line to Marseilles the jury were not obliged to find that the boxes were pillaged on the way,

or if they found they were, they were not obliged to find that the plaintiff's picture was among those missing, or that if it was it was not among those subsequently recovered. All these questions were for the jury. Even if the jury believed all the evidence, it was still a question of fact whether, in view of what the defendant knew of the risk, it was the care of a prudent owner to ship the paintings across the demarcation line into unoccupied France. See French Civil Code, Cachard (Rev. ed.) art. 1880, art. 1137. As for the medallions, the testimony of the defendant was that he took those from the Krueger Bank to a room his mother had in Paris and "got them back after the war." There is nothing to show that the plaintiff's medallions could not have been returned to her.

But the defendant insists that this action cannot be maintained against the administrator of Bonn's estate in Massachusetts because Bonn left a will duly established in France, in which he made his wife, now the wife of the defendant, his universal legatee, and because under French law the universal legatee, who takes all the property of the deceased, becomes personally chargeable with his obligations. The argument is that if suit had been brought in France it must have been brought against Mrs. Riché personally. This may be true. French Law of Wills, Pellerin, at pages 18, 41. But it is not controlling over the law governing the administration of estates in this Commonwealth. Here the administrator is liable to suit upon obligations of the deceased, and creditors resident here, of whom the plaintiff is one, are entitled to secure payment of their claims out of Massachusetts assets in the manner provided by Massachusetts law. At the moment of Bonn's death he owed to the plaintiff an obligation which had arisen under French law to return her property to her upon request. This obligation was chargeable against his Massachusetts assets. It was like a promissory note owed but not yet due. Even though at Bonn's death there was as yet no breach of his obligation, there was a breach when the plaintiff made her request to the universal legatee for a return of her property.

We think the request, if any was necessary, was properly made to the universal legatee in France. She was the general representative of the succession and of the personality of the deceased at the domicil of the deceased. The defendant had not at that time been appointed administrator here. A request to the defendant after his appointment would have been a barren gesture. There was no reason to suppose that the plaintiff's property was in this Commonwealth or in the control of the administrator appointed here in his capacity as ancillary administrator. The plaintiff can maintain her action here. She was not obliged to see Massachusetts assets swept away and then to go to France to assert her rights. G. L. (Ter. Ed.) c. 199. *Newell* v. *Peaslee,* 151 Mass. 601, 603–604. *Cowden* v. *Jacobson,* 165 Mass. 240, 244. *Tod* v. *Mitchell,* 228 Mass. 541. See *Second National Bank* v. *J. C. Lappe Tanning Co.* 198 Mass. 159, 162; *Rackemann* v. *Taylor,* 204 Mass. 394, 397, 399. The case of *Trudel* v. *Gagne,* 328 Mass. 464, is not in point. In that case there was no question of satisfying out of Massachusetts assets of the deceased an obligation which the deceased owed in his lifetime.

The denial of the defendant's motion for new trial presents nothing new and has not been separately argued.

*Exceptions overruled.*