## GHANA SUPPLY COMMISSION, Plaintiff,

v.

## NEW ENGLAND POWER COMPANY, Defendant and Third-Party Plaintiff,

v.

## INCONTRADE, INC., Third-Party Defendant and Fourth-Party Plaintiff,

v.

## TREFALCON CORPORATION, Fourth-Party Defendant.

Civ. A. No. 75–4166–G.

United States District Court, D. Massachusetts.

Sept. 7, 1979.

## MEMORANDUM OF DECISION ON DISCOVERABILITY

GARRITY, District Judge.

On October 2, 1975, plaintiff Ghana Supply Commission (hereinafter GSC), a subject of the Republic of Ghana, filed its original complaint against defendant New England Power Company (hereinafter NEPCO), a citizen of the Commonwealth of Massachusetts, to recover the unpaid portion of the sales price of fuel oil allegedly converted by NEPCO to its own use. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332. After nearly four years, the case, expanded to include third and fourth party defendants, is still at the discovery stage. The motions now before the court relate to a small, yet significant, segment of that discovery.

Before proceeding with the analysis of the issues, it will be helpful briefly to summarize the essential background to this litigation. On or about May, 1974, GSC en-

tered into a contract with Trefalcon Corporation, an American oil merchant and shipper, in which GSC promised to supply residual fuel oil refined in Ghana at an agreed F.O.B. price. Trefalcon sold the oil it received to Incontrade, Inc., who in turn sold some to NEPCO. Although relations between GSC and Trefalcon began smoothly, their association gradually deteriorated over the period from August 1974 to July 1975. According to GSC, it continued to supply oil to Trefalcon, but Trefalcon failed to meet several of its obligations under the contract. In particular, GSC claims that Trefalcon did not pay for much of the oil it received.

In May 1975, Mr. J. V. Mensah assumed the position of Managing Director of GSC and, with the assistance of high level Ghanaian officials, took steps to collect ·on the debt owed GSC by Trefalcon. Following unsuccessful attempts to negotiate with Trefalcon for payment, GSC commenced this action against NEPCO for unlawful conversion of the fuel oil, arguing both (a) that NEPCO could not have received title to the oil because the agreed-upon procedure for transferring title from GSC to Trefalcon had not been followed and (b) that NEPCO was not a bona fide purchaser in good faith because it knew or should have known that possession of a negotiable bill of lading, which Incontrade did not have, was a necessary condition to possession of title to the oil.

On August 30, 1975, the. National Redemption Council of the Republic of Ghana[1] created a Committee of Inquiry to in-

---

1. The government of Ghana has undergone significant change over the past nineteen years. From 1960 until 1966, the Republic of Ghana was a constitutional parliamentary state with autonomous spheres of executive, legislative and judicial power organized according to the terms of a written constitution. In 1966, a group of military officers assumed power and suspended the constitution. In 1969, the Military Command reactivated the constitution, reestablishing a system of parliamentary government which lasted until 1972, when the National Redemption Council, a group of military officers, took power, suspended the constitution, and vested all executive, legislative and judicial

power in themselves. On October 9, 1975, the name of the Council was changed to the Supreme Military Council without any substantive change in the centralized political structure of the Ghanaian government. Affidavit of Bediako Kwasi Nketiah, August 28, 1978, at ¶¶ 6, 7.

About June 5, 1979 a group of officers seized power by a coup, ending the reign of the Supreme Military Council, and arrested General Frederick William Kwasi Akuffo, former head of the Supreme Military Council. N.Y. Times, June 17, 1979, front page, col. 2. It is our understanding that on some later date General Akuffo was executed. N.Y. Times, July 30,

vestigate the indebtedness of Trefalcon Corporation to GSC, to explore the existence of possible fraud on the part of Ghanaians and to recommend methods for collecting the outstanding debt and sanctions against those suspected of wrongdoing. Executive Instrument 126, § 2 (August 30, 1975). The proceedings of the Committee were to be held in camera, Executive Instrument 126, § 4(3), and the Committee was expressly given power to compel attendance and testimony of witnesses. *Id.,* at §§ 5, 6. It appears that the testimony was recorded. See, Deposition of J. V. Mensah, Sept. 7, 1977, at 75. Although testimony was completed and briefs filed with the Committee by April 22, 1977, no final report has yet been issued.

NEPCO seeks to obtain by way of a request for documents, pursuant to Rule 34, Fed.R.Civ.P., by means of answers to interrogatories, and through questions on oral deposition, the content of certain documents, memoranda, reports and correspondence and the substance of testimony introduced before the Committee of Inquiry. The Republic of Ghana has asserted a limited privilege against disclosure of this information. It has produced all regular documents in its custody, possession or control of which were generated in the normal course of business and which were in existence prior to the creation of the Committee of Inquiry, even though these documents may have been produced as evidence before the Committee. However, documents created solely for the Committee and all oral testimony before the Committee have been withheld pursuant to a claim of executive privilege. It is the assertion of this privilege that forms the core of the present controversy.

Two motions are now before us for decision. First, NEPCO has moved for an order to compel production of documents requested in NEPCO's Request for Production of Documents dated May 22, 1978 insofar as the documents relate to the investigation conducted by the Ghanaian Executive Committee of Inquiry into the circumstances

surrounding GSC's sale of residual fuel oil to Trefalcon Corporation and Incontrade, Inc. Second, NEPCO, through a motion for sanctions, seeks an order precluding GSC from supporting certain claims and awarding against GSC the expenses incurred by NEPCO in obtaining adequate answers to its interrogatories. After studying the extensive briefs submitted by both parties and hearing oral argument, we order GSC to produce all documents sought by NEPCO's May 22, 1978 Request for Production of Documents, insofar as production of those documents has been opposed only on grounds of intragovernmental or executive privilege. NEPCO's motion for sanctions is denied without prejudice to its being renewed should GSC not comply fully with the orders of this court.

The following discussion of the issue of governmental privilege is divided into four sections. The first three sections treat important preliminary questions which are vital to a decision of the ultimate issue, which is presented in the fourth and final section.

## I. *Choice of Law*

■ First there is a threshold conflicts question: whether to apply the privilege law of the United States or of Ghana. Rule 501 of the Federal Rules of Evidence guides our choice:

> However, in civil actions and proceedings, with respect to an element of a claim or defense as to which the State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Jurisdiction in this case is based on the diversity grant of 28 U.S.C. § 1332 since the plaintiff is "[a] foreign states or citizens or subjects thereof" and the defendant is a citizen of Massachusetts. The crux of plaintiff's claim is to recover for unlawful conversion of fuel oil, a common law tort, and there is no federal law or strong federal interest involved. Under these circumstances *Erie Railroad Co. v. Tompkins,* 1938,

1979, front page. Since we deny GSC's claim of executive privilege, there is no need to determine the effect of these political changes on NEPCO's motion to compel.

304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, mandates that state law provide the rule of decision as to claims and defenses. See, *Domingo v. States Marine Lines,* S.D.N.Y. 1972, 340 F.Supp. 811, 816, n. 5; *Svenska Handelsbanken v. Carlson,* D.Mass.1966, 258 F.Supp. 448, 450; *Republic of Iraq v. First Nat. City Bank,* S.D.N.Y.1965, 241 F.Supp. 567, 572–73, aff'd 2 Cir. 1965, 353 F.2d 47, *cert. denied* 1966, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540; cf., *John Sanderson & Co. (Wool) Pty. v. Ludlow Jute,* 1 Cir. 1978, 569 F.2d 696, 697, n. 1. Fed.R.Ev., Rule 501 thus requires that we look to state law for resolution of the privilege question.

We disagree with NEPCO's arguments that United States federal law ought to apply. The cases cited to support this proposition fall into two groups. The first group includes cases like *Boeing Airplane Company v. Coggeshall,* D.C.Cir. 1960, 108 U.S.App.D.C. 106, 280 F.2d 654, which, although based solely on diversity, were decided well before the enactment of Fed.R. Ev., Rule 501, at a time when *Erie* was thought not to apply to questions of privilege. In the second group are cases like *Societe Internationale Etc. v. McGranery,* D.D.C.1953, 111 F.Supp. 435, *mod. on oth. grds., sub nom. Societe Internationale Etc. v. Brownell,* D.C.Cir. 1955, 96 U.S.App.D.C. 232, 225 F.2d 532, *mod. on oth. grds., sub nom., Societe Internationale v. Rogers,* 1958, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255, which apply federal privilege law in the context of overriding federal interests.

█ Having resolved the vertical conflicts problem, there remains a horizontal issue, namely, which state's law to apply. Since the purpose of Rule 501 is to create the same effect for the law of privilege as now exists for substantive law in diversity cases, H.R.Rep. No. 93–650, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News pp. 7082–83; H.R.Rep. No. 93–1597, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7100–7101, we should follow the rule of *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 and look to the conflicts law of Massachusetts, the forum state. Massachusetts applies its own law, characterizing questions of privilege as procedural. *Hoadley v. Northern Transportation Co.,* 1874, 115 Mass. 304, 306–307; cf., *Lenn v. Riche,* 1954, 331 Mass. 104, 111, 117 N.E.2d 129. See generally, K. B. Hughes, *Massachusetts Practice-Evidence,* § 3 (1961). Therefore, the controlling law on the subject of privilege in the instant case is that of Massachusetts, the forum state.[2]

The choice of American as opposed to Ghanaian law comports with basic standards of fairness. GSC as plaintiff in this litigation has selected a United States forum in which to press its claims, and it is therefore only reasonable that GSC should be held to the procedural law of its chosen forum. *Societe Internationale, Etc., supra,* 111 F.Supp., at 444. All the more ought this to be so when the issue involves the defendant's access to highly material evidence through legitimate discovery procedures.[3] Furthermore, Massachusetts does

---

**2.** GSC does not contest the choice of United States law. Instead it argues only that the laws of the United States and the laws of Ghana on the privilege issue are identical. Since we hold that Massachusetts law applies, we do not explore this somewhat complex issue of comparative law, except to note our serious doubts about the correctness of plaintiff's view. Compare, 8 Wigmore, Evidence (McNaughton rev. 1961) § 2378(g), n. 7, with *Duncan v. Cammell, Laird & Co.* [1942], 1 All E.R. 587 (H.L.). See generally, McCormick on Evidence, 230–31 (2d ed., 1972).

**3.** There can be little question about the materiality of the evidence sought by NEPCO. The objectives of the Committee's inquiry go to the very heart of the relationship of Trefalcon to GSC, a relationship that is central to NEPCO's defense that it was a bona fide purchaser in good faith without notice of any defects in Incontrade's title to the oil. Moreover NEPCO asserts some persuasive reasons why private interviews of the witnesses who appeared before the Committee might be both impractical and dangerous, *see generally,* N.Y. Times, July 30, 1979, front page, col. 4; and why an interview could not possibly substitute for access to a witness's formal testimony. We might also add that unlike cases such as *United States v. Reynolds,* 1953, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727, the government of Ghana has not offered any assurances that it would make the transcript of his testimony before the Commit-

have substantial contacts with the transactions involved in the present litigation. See, Restatement (Second) Conflict of Laws § 139(2).

## II.   Scope of the Privilege

On April 9, 1979 we received a document entitled "Claim of Executive Privilege" dated March 9, 1979, and signed by Frederick William Kwasi Akuffo, Head of State and Chairman of the Supreme Military Council of Ghana. This document was later authenticated by Joseph Felli, Deputy Consul-General of the Republic of Ghana, on April 30, 1979. This "Claim of Executive Privilege" seems to satisfy all the requirements of a formal claim of privilege: it appears to be signed by an official having control over the relevant matters and represents a formal determination that the documents and information sought should be withheld in the public interest. *United States v. Reynolds,* 1953, 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727; *Duncan v. Cammell, Laird & Co.* [1942], 1 All E.R. 587, 593 (H.L.); K. B. Hughes, Mass. Practice—Evidence, § 172; *cf., Badu v. The Republic,* [1974], 2 Ghana L.Rep. 361. However, the continuing validity of this formal claim is questionable after the recent coup and the execution of General Akuffo. Nevertheless we do not rest our decision on the absence of a properly executed claim since we may assume that the Ghanaian government would be prepared to cure this oversight, if it remains interested in pursuing this lawsuit.

Because the existence of a privilege depends on the reasons for preserving secrecy and the nature of the information to be kept secret, it is important at this stage to outline as precisely as possible the contours of the privilege asserted on behalf of the Republic of Ghana. The task is rendered quite difficult by the absence of any specification of the grounds for invoking the privilege in the April 9, 1979 document.

██   It is quite clear from the briefs submitted by GSC that the Republic of Ghana does not argue that disclosure of this sensitive information would endanger its national security or threaten its diplomatic relations. No one insists that the relevant documents contain military or diplomatic secrets, even though counsel is well aware that a claim of this type would strengthen considerably the submission supporting the existence of the privilege. Instead the Ghanaian government appears to support its position by three arguments: (1) that the command of the Ghanaian government that the Committee's sessions be held *in camera* creates an official privilege barring discovery of matters that occurred before the Committee, (2) that the overall "sensitivity" of the documents justifies their nondisclosure, and, most significantly, (3) that the confidentiality of the documents ought to be preserved in order to encourage open communications with and within the government. *Id.*[4] The order of a foreign government that sessions be held *in camera* does not automatically create a privilege under American law, although it is a factor to consider before ordering disclosure, and no American privilege exists protecting "sensitive" documents in general without a more particularized showing as to the reason for their sensitivity. Therefore, the strongest basis for the privilege asserted in this case is found in the third argument, viz., encouraging unrestrained communication with and within government.

## III.   Status of GSC

██   We must dispose of a third preliminary matter before turning to consideration of the privilege claim itself: is GSC a private Ghanaian corporation or is it an agent of the Republic of Ghana for purposes of this lawsuit? The proper characterization of the relationship between GSC and the

tee available to a witness willing to submit to a private interview, in order to permit him to refresh his recollection.

**4.** Much of this summary necessarily must be *pieced together from the discussion of Duncan*

*v. Cammell, Laird & Co., Ltd.,* [1942], 1 All E.R. 587 (H.L.), a case upon which counsel for GSC heavily relies. Neither counsel nor the Ghanaian government set out in a clear manner the precise outlines of the privilege at stake.

Ghanaian government is crucial to the issue of whether any government privilege has been waived by the commencement of this lawsuit.

The main function of GSC is to procure for the Government of Ghana all supplies and stores which, unless the Prime Minister approves another source, the Government purchases exclusively from GSC with public funds. The Ghana Supply Commission Act (hereinafter "Act"), 1960, § 3(1). In addition to buying for the Ghanaian government, GSC may also, under other provisions of the Act, purchase for local authorities, other statutory bodies or educational institutions. The Prime Minister or someone he delegates advances GSC money to pay for the supplies and stores it procures, and GSC charges the Ghanaian government enough to cover the cost and any overhead and interest expenses. The Board of the GSC, including a chairman, deputy chairman and four other members, is appointed by the Prime Minister with the prior approval of the Governor-General. The remaining officers and employees are appointed and their terms of employment are set by the GSC Board. Although GSC is obligated to observe any general or particular directions which may be given by the Prime Minister or his delegate, GSC has general autonomy to decide from whom, and the conditions under which, it makes purchases.

As additional evidence of the close nexus between the GSC and the Ghanaian government, NEPCO points to the fact that counsel for GSC, who is also counsel for the Republic of Ghana, has not been clear about differentiating the corporation from the Government. In its Memorandum in Support of Claim of Executive or Intragovernmental Privilege GSC urges apparently inconsistent positions. In footnote 1 on page 13, plaintiff argues that GSC has standing to assert executive privilege on behalf of the Government, since it is "an agency of the Ghanaian government." On the other hand, at pages 20 and 21 and again on page 24 of the same Memorandum, plaintiff claims that the status of GSC closely resembles that of a private, government-created corporation. Furthermore, the August 28,

1978 affidavit of Bediako Kwasi Nketiah, at paragraph 9, notes that the GSC "does not, nor has it ever functioned independently of executive or legislative power." Finally, plaintiff's complaint, in paragraph 1, describes GSC as "an official agency of the Republic of Ghana . . .."

In support of its contention that GSC is a private corporation, not an arm of the Ghanaian government, plaintiff stresses various sections of the 1960 Act, noting principally that GSC is given considerable autonomy in its purchasing decisions, that it is "a body corporate having perpetual succession and a common seal, and may sue and be sued in its corporate name", and that it may finance its activities by receipt of government loans bearing interest which must be repaid to the government.

Plaintiff in particular makes a great deal of the "sue and be sued" language in the Act. The "sue and be sued" clause, intended primarily to waive any residual sovereign immunity, surely cannot transform the GSC into an independent private corporation for purposes of governmental privilege where the structure of the relationship between GSC and the Republic of Ghana suggests the opposite conclusion. Nor can we place much reliance on the fact that GSC must repay government loans with interest when, as here, GSC merely resells its supplies, bought with advances of public funds, to the government, including in the sales price an amount covering any interest charges. In effect, the government guarantees to pay any interest GSC owes it. The risk in all the purchase and sale transactions entered into by GSC therefore falls ultimately on the Republic of Ghana, not on GSC.

The two principal cases cited by the Republic of Ghana do not lend support to its contention that GSC is a private, government-created corporation. The issue in *Republic of Mexico v. Hoffman*, 1945, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729, was whether the sovereign immunity of Mexico precluded seizure of a vessel owned by the Mexican government and leased to a private corpora-

tion in return for 50% of the net profits attributable to the vessel in its commercial freighting business. The court held that sovereign immunity did not extend to the vessel, since it was neither in the possession nor service of the government. 324 U.S. at 38, 65 S.Ct. 530. By contrast, GSC is intimately involved in directly serving the Republic of Ghana. *Victory Transport Inc. v. Comisaria General*, 2 Cir. 1964, 336 F.2d 354, cert. denied, 1965, 38 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698, is plainly distinguishable from the instant case. Although the court there did conclude that the courts of those countries which have adopted the restrictive theory of sovereign immunity "have generally considered purchasing activity by a state instrumentality, *particularly for resale to nationals,* as commercial or private activity," 336 F.2d, at 362 (emphasis added), it stressed that the wheat was not used in the public service of Spain because it was purchased in order to be resold to private residents, quite likely at a profit. 336 F.2d, at 361. GSC, by contrast, possessed no authority to purchase supplies for other than national and local governmental bodies or educational institutions. Act, §§ 3(1), 4. *Cf.,* 28 U.S.C. § 1603(b), 1604.[5] See generally, Restatement (Second) Foreign Relations Law of the United States, § 66, Reporter's Note 2, pp. 202–203 (1965).

The Republic of Ghana compares GSC to government-created corporations in the United States which, it argues, are treated as private litigants by virtue of either express waivers of sovereign immunity through "sue and be sued" clauses, see, e. g., *Garden Homes v. Mason,* 1 Cir. 1957, 249 F.2d 71 (GNMA), or implied waivers derived from a pervasive Congressional intent, see, e. g., *Keifer and Keifer v. Reconstruction Finance Corp.,* 1939, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (RFC). We are not per-

suaded by this analogy. See generally, *Small Business Adm'n v. McClellan,* 1960, 364 U.S. 446, 448–50, 81 S.Ct. 191, 5 L.Ed.2d 200; *Emer. Fleet Corp. v. West. Union,* 1928, 275 U.S. 415, 422–26, 48 S.Ct. 256, 72 L.Ed. 531. None of the American cases cited by the Republic of Ghana involves the issue of governmental evidentiary privilege. Moreover, the Ghana Supply Commission Act contains no similar waiver. Indeed, it could be inferred from the presence of an express "sue and be sued" clause in the Act creating a corporation that Congress believed that the corporation might otherwise be treated as an arm of the Government for purposes of sovereign immunity. A "sue and be sued" clause permits individuals to sue the corporation but does not otherwise transform the relationship between the corporation and the government.

The structure of the GSC/Ghana relationship, coupled with the statements of counsel for the GSC/Ghanaian government and of Bediako Kwasi Nketiah, Consul-General representing the former Ghanaian government to the United States, strongly supports the conclusion that the GSC is an agent of the Ghanaian government for purposes of the lawsuit. We hold, therefore, that the Ghanaian government, through GSC, is a party-plaintiff to this lawsuit.

## IV. *Merits of the Privilege Claim*

■ We turn now to the law of Massachusetts on the subject of government privilege. The mandate of *Erie* requires a creative search of Massachusetts and federal authority in order to predict what the Massachusetts Supreme Judicial Court would hold when presented with this issue. See, *C. I. R. v. Bosch's Estate,* 1967, 387 U.S. 456, 464–66, 87 S.Ct. 1776, 18 L.Ed.2d 886. Our task is complicated by the paucity of relevant Massachusetts caselaw.

---

**5.** Although neither party raised the point, it might be argued that the transaction out of which this lawsuit arose, the sale of oil to a private American corporation, was a private act and thus that GSC is acting in a private capacity in bringing this suit. In our view, however, the close nexus between the Republic of Ghana and GSC viewed against the background of the liberal standards for characteriz-

ing that relationship in the privilege area and the fact that the Ghanaian treasury will indirectly benefit from recovery in this lawsuit (a damage award here will reduce GSC's future need for public funds by which to purchase supplies) compel the conclusion that GSC is an agent of the Republic for purposes of this litigation.

Hughes's volume devoted to the Massachusetts law of evidence in the Massachusetts Practice Series recognizes the proposition that a governmental body, by commencing a civil action, waives any privilege of nondisclosure it might have had, at least regarding matters not immediately implicating military or diplomatic secrets. K. B. Hughes, *Massachusetts Practice—Evidence,* § 172, at 182, n. 10 (1961). As support Hughes offers only a federal case construing the discovery provisions of the Federal Rules of Civil Procedure. And federal authority is cited for the rule that military or diplomatic secrets are privileged. Hughes, *supra,* at 181. Moreover, Leach and Liacos in their *Handbook of Massachusetts Evidence* state the same waiver rule, except in the context of criminal proceedings. Leach, W. B.; Liacos, P. J., *Handbook of Massachusetts Evidence,* 150–51 (4 ed. 1967). Significantly only federal cases are cited.

The few Massachusetts cases bearing on the privilege of a government to withhold information on grounds of public policy address the distinct, yet related, question of when and how the identity of a government informer must be revealed to a private party. E. g., *Commonwealth v. Ennis,* 1973, 1 Mass.App. 499, 301 N.E.2d 589, 590–92; *Pihl v. Morris,* 1946, 319 Mass. 577, 579–80, 66 N.E.2d 804; *Wheeler v. Hager,* 1936, 293 Mass. 534, 536, 200 N.E. 561; *Commonwealth v. Congdon,* 1928, 265 Mass. 166, 174–75, 165 N.E. 467; *Attorney General v. Tufts,* 1921, 239 Mass. 458, 491–92, 131 N.E. 573; *Worthington v. Scribner,* 1872, 109 Mass. 487. Although not entirely clear, it appears that the privilege of nondisclosure extends only to the identity of the informant and does not also include the content of his information, which almost always would be presented by the government at trial in any event. Even though the Massachusetts law on informant privilege is not particularly germane, it is significant that many of the cases cite federal precedent along with Massachusetts caselaw when discussing the nature of the privilege and the circumstances under which it is available. See, e. g., *Ennis, supra,* 301 N.E.2d at 590–92; *Wheeler, supra,* 293 Mass. at 536, 200 N.E.2d 561; *Congdon, supra,* 265 Mass. at 174–75, 165 N.E.2d 467; *Tufts, supra,* 239 Mass. at 491, 131 N.E. 573. Because recognized Massachusetts treatise and case authority relies heavily on federal precedent in analyzing claims of government privilege, it is our opinion that the Massachusetts Supreme Judicial Court would look to federal law, as well as other authority, in those areas of government privilege for which there is no controlling Massachusetts law, and we adopt that approach for this case, especially since we find no indication that Massachusetts would refuse to follow the majority position.[6] *Raymond v. Eli Lilly & Co.,* D.N.H.1976, 412 F.Supp. 1392, 1396–1401, aff'd per curiam 1 Cir. 1977, 556 F.2d 628; *Hardy v. Volkswagen of America,* D.Pa.1975, 65 F.R.D. 359, 361–63; *Oresman v. G. D. Searle & Co.,* D.R.I.1971, 321 F.Supp. 449, 453–54, 456–57; see *C. I. R., supra.*

There are two different approaches to resolving the question of whether a privilege otherwise available to the government can be invoked against the defendant in civil litigation to which the government is a party-plaintiff. By far the great weight of authority holds that fairness to the defendant requires the government to make available all information relevant to the defense insofar as that information does not contain military or diplomatic secrets or involve the informant privilege. The theory is one of automatic waiver triggered by the government's instituting suit. *Federal Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.,* W.D.Okl.1971, 53 F.R.D. 260, 262; *United States v. continental Can Company,* S.D.N.Y.1958, 22 F.R.D. 241, 245; 8 *Wigmore on Evidence* (McNaughton rev. 1961), § 2379, at 812; *McCormick's Handbook on*

6. Primarily because there is a widely accepted analysis of the government privilege doctrine, because the issue is a relatively simple one, and because some analogous Massachusetts authority in the informant privilege context is available, we have chosen not to certify this question of state law to the Supreme Judicial Court of Massachusetts. See, *Daigle v. Hall,* 1 Cir. 1977, 564 F.2d 884, 886.

the *Law of Evidence*, § 109, at 234; *Brewer v. Hassett*, D.Mass.1942, 2 F.R.D. 222, 223; 95 L.Ed. 425, 447 (1951); *cf., United States v. Reynolds*, 1953, 345 U.S. 1, 12, 73 S.Ct. 528, 97 L.Ed. 727; *United States v. Watkins*, S.C.N.Y.1946, 67 F.Supp. 556, 561, *aff'd* 2 Cir. 1946, 158 F.2d 853. *But see, Timken Roller Bearing Company v. United States*, N.D.Ohio 1964, 38 F.R.D. 57, 65. Some cases appear to apply a balancing standard, weighing the defendant's need for the information against the importance of maintaining secrecy, or they at least appear to allow a wider range of exceptions to the waiver rule. *Timken Roller Bearing Company, supra*, at 64–69; *see, Mitchell v. Bass*, 8 Cir. 1958, 252 F.2d 513; *Fusco v. Richard W. Kaase Baking Co.*, N.D.Ohio 1962, 205 F.Supp. 459, 463–64; *United States v. General Motors Corporation*, N.D.Ill.1942, 2 F.R.D. 528, 530; 4 Moore's Federal Practice ¶¶ 26.61[6.4], 26.61[7].

In several of the cases adopting a waiver approach, the United States seeks to enforce its civil regulatory authority, and thus, unlike NEPCO in the instant case, the defendant is exposed to a possible penalty. Certainly the fact that a defendant faces a regulatory penalty increases the unfairness of allowing the government to withhold material information and strengthens the case for a waiver. However, we do not think that this distinction serves to render the waiver theory inapplicable to this case, especially where, as here, the defendant is exposed to the possibility of paying twice for the oil it received if plaintiff prevails.

▪ The plaintiff argues that even if GSC is bringing this lawsuit on behalf of the Republic of Ghana and even if a production order might be appropriate in cases involving only domestic parties, the variable of international comity at stake here should lead us at least to require that NEPCO exhaust direct discovery of the facts surrounding the Trefalcon transaction by deposition, interrogatory, or letters rogatory examination of witnesses and analysis of all available documents before ordering production of the material subject to the claim of privilege. We do not agree. International comity counsels restraint whenever a domestic court's action may cause the violation of another nation's law. Note, *Foreign Nondisclosure Laws and Domestic Discovery Orders in Antitrust Litigation*, 88 Yale L.J. 612, 614 (1979). The comity principle does not prevent domestic courts from issuing orders that conflict in some general sense with the rules of a foreign sovereign. If that were so, a foreign nation could bring suit against a domestic party in an American court and then unilaterally restrict the defendant's access to information and otherwise exert control over the course of the litigation.

An order to produce documents and testimony in the instant case would not necessarily cause a violation of Ghanaian law. Our order merely puts the Ghanaian government as plaintiff to a choice. If it wants to continue the litigation, it must make an exception to its nondisclosure order—the plaintiff almost certainly has the power to do so—or face sanctions for failure to comply with our discovery order. The plaintiff, of course, also has the option to dismiss the lawsuit voluntarily at any time. No party to this case is placed in the position of risking violation of foreign law by complying with a discovery order of this court.

We conclude that the Massachusetts Supreme Judicial Court, if confronted with this issue, would follow the majority position and hold that the Republic of Ghana, by instituting this civil action through the GSC, has waived any privilege it might have otherwise had to prevent disclosure of information sought by NEPCO that is material to NEPCO's defense. In so holding we have given some consideration to the impact on the Republic of Ghana resulting from disclosure. It appears to us that disclosure will not infringe seriously on any legally recognized privilege. Aside from those government privileges protecting military or diplomatic secrets of state and the identity of informants, two other privileges designed to encourage communications with and within government are firmly established. One prevents disclosure of the testi-

mony of private citizens before government investigative bodies. *Brockway v. Department of Air Force,* 8 Cir. 1975, 518 F.2d 1184; *Machin v. Zuckert,* D.C.Cir. 1963, 114 U.S.App.D.C. 335, 316 F.2d 336; *Boeing Airplane Company v. Coggeshall,* D.C.Cir. 1960, 108 U.S.App.D.C. 106, 280 F.2d 654. The reason for this privilege is that administrative investigating bodies, like the Air Force Board of Investigation that explores the causes of airplane accidents in order to improve air safety, do not have the power to compel the testimony of private parties. Consequently the investigators must rely on a witness's voluntarily complying with a request to testify. Without the assurance of confidentiality, corporate officers would be reluctant to volunteer vital information that, if it were made public, might subject their corporations to increased risk of liability in private lawsuits. Because the Committee of Inquiry had the power to compel testimony, the kind of interest that this privilege was designed to protect does not exist in the instant case.

The second privilege, on the other hand, might apply to at least some portions of the documents sought by NEPCO. This privilege protects from public exposure the deliberative and policymaking processes of governmental bodies in order to encourage intragovernmental communications. *Machin, supra,* 114 U.S.App.D.C. at 338, 316 F.2d at 339; *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena,* D.D.C.1966, 40 F.R.D. 318, 324–25, aff'd per curiam, D.C.Cir. 1967, 128 U.S.App.D.C. 10, 384 F.2d 979, *cert. denied* 1967, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361; *O'Keefe v. Boeing Company,* S.D.N.Y. 1965, 38 F.R.D. 329; 8 *Wigmore on Evidence* (rev.1961), § 2378, at 805–08. Although the greater part of the information sought by NEPCO, especially testimony, almost certainly contains only facts or fact summaries, it is quite likely that sections of the documents reflect policymaking or deliberative activities, e. g., analyses of the evidence obtained and deliberations concerning the most appropriate government response to the situation. With respect to these sections, the Republic of Ghana has a legitimate interest to protect. However,

we doubt whether most of this information is relevant to NEPCO's defense within the meaning of Fed.R.Civ.P., Rule 26, and thus doubt whether it is discoverable, even absent a claim of privilege. Hence it appears likely that the Republic of Ghana and the GSC can protect themselves adequately without invoking a claim of privilege at all. Of course, if this policymaking information is relevant, it must be disclosed, for, as we have held, any otherwise available privilege has been waived.

■ When an agency of government institutes suit, any obligation to disclose relevant information extends to the government *qua* government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff. Annot. 95 L.Ed. 425, 445 (1951); see, *Harvey Aluminum (Incorporated) v. N. L. R. B.,* 9 Cir. 1964, 335 F.2d 749, 754–55; *Bank Line v. United States,* S.D.N.Y.1948, 76 F.Supp. 801, 803–04. But see, *United States v. Bethlehem Steel Corp.,* S.D.N.Y.1958, 21 F.R.D. 568, 571. If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit. *Bank Line, supra,* at 804. GSC must, therefore, produce all relevant documents sought by NEPCO, not just those in its immediate possession.

We grant NEPCO's motion to compel and order the Ghana Supply Commission to produce all documents encompassed by NEPCO's May 22, 1978 Request For Production Of Documents, insofar as disclosure of those documents has been opposed solely on the claims of intragovernmental or executive privilege involved in this motion. In view of plaintiff's having filed "Plaintiff's Specifications With Respect To Question 17 of NEPCO's Interrogatories To The Ghana Supply Commission, Made Pursuant To The Court's Order Of September 11, 1978," and in light of the substantial argument of privilege asserted by GSC to justify its failure to comply with other discovery requests, we

deny defendant's motion for sanctions, including expenses. However, if the defendant believes that the "Specifications" filed by GSC do not satisfactorily answer defendant's interrogatory number 17, or if the plaintiff fails to comply with any orders of this court, the defendant may renew its motion for sanctions. The plaintiff is further reminded that, pursuant to Magistrate Princi's orders, it is under a continuing duty to supplement its answers to defendant's interrogatories, including No. 21 of NEP-CO's December 16, 1976 set of interrogatories, to reflect all discoverable information known or knowable from sources under its control.