State of NEW YORK, by and through Joseph H. BOARDMAN, as Commissioner of the New York State Department of Transportation, and the New York State Department of Transportation, Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, doing business as Amtrak, Defendant.

No. 1:04CV0962 (DNH/RFT).

United States District Court, N.D. New York.

Jan. 9, 2006.

Hon. Eliot Spitzer, Attorney General for the State of New York, Edward M. Scher, Assistant Attorney General, of Counsel, Albany, NY, for plaintiff.

Arent Fox PLLC, Richard J. Webber, Timothy F. Brown, of Counsel, Washington, D.C., for defendant Amtrak.

### ORDER

TREECE, United States Magistrate Judge.

A rather novel discovery issue has come before this Court, which has not been fully addressed in the Second Circuit and may be a matter of first impression. It was Defendant Amtrak who initially sought court intervention to decide this critical discovery imbroglio, after the parties made an unsuccessful, albeit good faith, effort to resolve it themselves. Dkt. No. 23, Richard J. Webber, Esq., Lt–Mem., dated Dec. 9, 2005, with Exs. Promptly thereafter, pursuant to the Court's direction, Plaintiff State filed a letter-memorandum rebutting Amtrak's contentions. Dkt. No. 24, Edward M. Scher, Esq., Lt–Mem., dated Dec. 14, 2005. With the hope that we could expeditiously resolve this matter, a telephonic conference was held on December 16, 2005. Text Order, dated Dec. 15, 2005. Regrettably, however, the telephonic conference resolved very little, if anything, causing the Court to grant the parties further opportunity to brief this matter. Text Order, dated Dec. 16, 2005. On December 23, 2005, both parties filed respectively their letter-memorandum. Dkt. No. 25, Def.'s Lt–Mem., dated Dec. 23, 2005; Dkt. No. 26, Pl.'s Lt–Mem., dated Dec. 23, 2005.

Succinctly, although there are other related subtext issues to decide as well, the crux of this novel discovery matter is this: Amtrak seeks discovery from the Office of the State Comptroller ("OSC") whom the Plaintiff State contends is not a party to this action and therefore not subject to Rule 34 discovery demands. To appreciate the complexity of this matter, a recitation of the facts of this litigation is warranted.

1. This Court surmises that similar legislation existed prior to 1971. McKinney L.1971, c. 639. There is also another more recent, corollary legislation that pertains to the interstate high speed intercity rail passenger network compact, which

## I. BACKGROUND

### A. The Litigation

The New York State Legislature granted authority to the Commissioner of Transportation ("Commissioner") to "cooperate and contract with the national railroad passenger corporation for any intercity rail passenger services deemed necessary, convenient or desirable[.]" N.Y. TRANSP. LAW § 14–c(1) (1971).[1] As such, the Commissioner is "empowered to contract with [Amtrak] and to do all other things necessary, convenient or desirable on behalf of the state to secure ... full benefits ... and to contract ... on behalf of the state to effect the intercity rail passenger service program[.]" Id.

In 1996, the State entered into a contract with the Federal Railroad Administration for a grant of funds to be applied toward the development of high speed railroad passenger equipment through the rehabilitation and upgrading of two Rohr Turboliner ("RTL") trainsets owned by Amtrak. Dkt. No. 1, Compl. at ¶ 10; see also supra n. 1. In furtherance of the program to develop a high speed passenger rail, the State entered into a contract with Super Steel Schenectady, Inc. ("Super Steel") to remanufacture and upgrade two RTL trainsets. Compl. at ¶ 11. After the parties had entered into a "memorandum of understanding," on March 14, 2000, "the State in the name of the People of the State of New York, acting by and through Commissioner of Transportation and the Department of Transportation ['DOT'] and Amtrak (as the 'National Railroad Passenger Corporation') entered into a contract to provide for the enhancement of a high speed passenger rail program along the Empire Corridor." Compl. ¶ 13 & Ex. A (the contract).[2] In very general terms, inter alia, the contract imposed upon each of the parties obligations to remanufacture and modernize seven trainsets and to share the costs of the upgrade and improvements. In this respect, Amtrak is obligated to deliver seven of its trainsets for modernization and the State,

seems inextricably related to this litigation. N.Y. TRANSP. LAW § 19 (1990).

2. On June 19, 2001, this contract was amended. Compl. at ¶ 14, Ex. B (supplemental agreement).

through Super Steel, would undertake the remanufacturing and modernization with the expectation that such revitalized trains would be used on the Empire Corridor. *See generally* Compl. at ¶¶ 15–24.[3]

A term within the Contract, which comes into play in this discussion, deals with Amtrak permitting the Department of Transportation ("DOT") and OSC to inspect all books and audit the accounts related to the project. Compl, Ex. A, sec. 10(a). OSC did in fact conduct several audits related to this contract. *See, e.g.,* Dkt. No. 23, Ex. C (OSC's report, dated June 12, 2003, to DOT on the project). Two of those audits were of Amtrak and Super Steel. Dkt. No. 23, Lt–Mem. at p. 1 & Exs. B & C.

On August 13, 2004, the State initiated this high profile litigation [4] alleging two causes of action claims that Amtrak is liable for specific performance (First Claim) and breach of its contractual obligation (Second Claim) in the amount of $477,226,447. Compl. at ¶¶ 25–79. On September 23, 2004, Amtrak filed its Answer with eighteen (18) Affirmative Defenses. Dkt. No. 6, Ans.

### B. Discovery Dispute

Discovery came to a halt when the State apprised Amtrak it would not search for nor produce any records from OSC, specifically OSC's emails. Dkt. No. 23, Lt–Mem. at p. 1 & Ex. B. Amtrak asserts that OSC has relevant documents by virtue of the audits and possibly other reviews performed by this agency and it is essential that Amtrak uncovers the bases of OSC's findings and conclusions regarding Amtrak, Super Steel and the State's performance of their obligations pursuant to the agreement. *See* Dkt. Nos. 23 &

25. Conversely, it is the State's position that only those records found in DOT's documents should be produced since OSC is not a party to this action; DOT is the sole Plaintiff in this action and Rule 34 discovery should be restricted to this state agency. *See* Dkt. Nos. 24 & 26.

Amtrak's perspective on who is the Plaintiff, which accordingly would define the scope of discovery, is basic and elemental: For example, Amtrak notes that the caption in the Complaint identifies the true Plaintiff as the "State of New York" and not DOT. Dkt. No. 25 at pp. 2–3; *see also* Compl. In support of Amtrak's view and perspective is the Complaint itself which states that "Plaintiff, State of New York ('State'), is a sovereign State" and all other references to the Plaintiff in the Complaint happens to be to the "State." Compl. at ¶ 1. For litigation purposes, as argued by Amtrak, the State is one entity supreme over all of the executive agencies, and possibly other state agencies, who are subject to the State's control. In the alternative, Amtrak argues that it makes no difference if the Complaint named DOT rather than the State as the plaintiff since DOT can only act on behalf of the State, not independently of the State. Dkt. No. 25 at p. 3 (citing N.Y. EXEC. LAW § 63(1)).[5] Under basic agency principles then, any action of a state agency is an action of the State, and if that is so, all state agencies are subject to a Rule 34 demand for discovery. *Id.*

The State takes the contrary position that only a party can be subjected to a Rule 34 discovery demand and in this case OSC is not a party even if it performed some audits as permitted by the terms of the contract

---

**3.** This contract seems to be consistent with the intent of the New York Transportation Law:

"The Commissioner may on such terms and conditions as he may determine necessary ... construct ... renovate, improve, extend, or repair any such intercity rail passenger service facility or any related services and activities, or may provide for such by contract, lease or other arrangement on such terms as the commissioner may deem necessary ...."

N.Y. TRANSP. LAW § 14–c(3).

**4.** Prior to and including the commencement of the litigation, this matter has been the subject of many newspaper articles throughout the State.

**5.** This statute reads in part that

[n]o action or proceeding affecting the property or interests of the state shall be instituted, defended or conducted by any department, bureau, board, council, officer, agency or instrumentality of the state, without a notice to the attorney-general apprising him of the said action or proceeding, the nature and purpose thereof, so that he may participate or join therein if in his opinion the interests of the state so warrant.

N.Y. EXEC. LAW § 63(1).

which is at the heart of this litigation. This litigation, in the State's view, is between DOT, on behalf of the State, and Amtrak, and no one else and nothing more. Since OSC is not a party, any discovery of OSC's records will have to be obtained by a subpoena pursuant to Rule 45. FED. R. CIV. P. 45. Underpinning this contention, the State makes a further point that not all of the executive agencies of the State are monolithic; the Legislature chose to create separate and independent executive governmental agencies with totally different functions and responsibilities; and moreover, the Comptroller is an independent constitutional official with the responsibility of overseeing, rather than operating state government. Dkt. No. 24.

During the telephonic conference held on December 16, 2005, the Court raised another issue closely related to whether Rule 34 is applicable to OSC's records for this controversy. DOT has already advised Amtrak that they will provide all of OSC's final reports, which are in its possession. However, Amtrak wants to review all of the predecisional records of these audits. By seeking these predecisional records, it was the Court's view that the Deliberative Process Privilege may impede possession of any such records. Therefore, the implication of the Deliberative Process Privilege became another issue for the parties to research and discuss.

## II. DISCUSSION

A party may make a demand to produce any designated relevant documents which "are in the possession, custody, or control of the party upon whom the request is served[.]" FED. R. CIV. P. 34(a)(1). Herein, Amtrak has demanded from Plaintiff records of OSC. The hypothesis upon which Amtrak makes such a demand are predicated upon (1) the State of New York including all agencies as a party to this action and/or (2) Comptroller's records are deemed within the possession, custody, and/or control of DOT. Dkt. No. 25 at p. 2.

### A. Who is the Plaintiff

■ The Plaintiff correctly observes that Amtrak has erroneously construed all executive agencies of the State as one entity. Dkt. No. 24 at p. I. The New York State Constitution in its infinite wisdom contemplated a separation of powers within the executive branch of government. By virtue of its pronouncement, the Constitution indisputably distinguished OSC from all other state departments. To appreciate this demarcation, we need not look any further than the State's constitution and subsequent enabling legislation.

All of the executive departments, except OSC, were formed under Article V, Section 1, of the New York Constitution, which states that there shall not be any more than twenty-two civil departments in the state government. One of those civil departments formed under this constitutional provision is the Department of Transportation with the mandate of "overall responsibility for balanced transportation policy and planning." N.Y. TRANSP. LAW § 10 (Policy). DOT's enabling legislation states

[t]here shall be in the state government a department of transportation. The head of the department shall be the commissioner of transportation, who shall be appointed by the governor, by and with the advice and consent of the senate, and hold office until the end of the term of the governor by whom he was appointed and until his successor is appointed and has qualified.

N.Y. TRANSP. LAW § 11; see also N.Y. CONST. art. V, § 4.

Of the multitude of general duties and functions to meet its constitutional and legislative mandates, the Commissioner is to "formulate and execute contracts[.]" N.Y. TRANSP. LAW § 14(14). And, in this respect, the Commissioner exercised his statutory authority by entering into a contract with Amtrak to complete the intercity passenger rail project. See supra Part I.B.

Unlike the twenty-two civil departments and their respective commissioners, the Comptroller's creation and authority is formed under a separate constitutional provision:

The comptroller and attorney-general shall be chosen at the same general election as the governor and hold office for the same term, and shall possess the qualifications provided in section 2 of article IV. The legislature shall provide for filling vacancies in the office of comptroller and of attorney-general. No election of a comptroller or an attorney-general shall be had except at the time of electing a governor. The comptroller shall be required: (1) to audit all vouchers before payment and all official accounts; (2) to audit the accrual and collection of all revenues and receipts; and (3) to prescribe such methods of accounting as are necessary for the performance of the foregoing duties. The payment of any money of the state, or of any money under its control, or the refund of any money paid to the state, except upon audit by the comptroller, shall be void, and may be restrained upon the suit of any taxpayer with the consent of the supreme court in appellate division on notice to the attorney-general. In such respect the legislature shall define the powers and duties and may also assign to him or her: (1) supervision of the accounts of any political subdivision of the state; and (2) powers and duties pertaining to or connected with the assessment and taxation of real estate, including determination of ratios which the assessed valuation of taxable real property bears to the full valuation thereof, but not including any of those powers and duties reserved to officers of a county, city, town or village by virtue of sections seven and eight of article nine of this constitution. The legislature shall assign to him or her no administrative duties, excepting such as may be incidental to the performance of these functions, any other provision of this constitution to the contrary notwithstanding.

N.Y. CONST. art. V, § 1.

█ In essence, the Comptroller and OSC are totally autonomous from the governor and the rest of the executive branch. *See* N.Y. EXEC. LAW § 40.[6] The Comptroller is

an elected official and not appointed by the governor such as the Commissioner of Transportation. The commissioners serve at the pleasure of the governor whereas the Comptroller serves at the will of the people, facing an election every four years like the governor. As the chief auditor and top accountant for all of New York State's governance, whether state or local, the Comptroller acts in a quasi-judicial capacity in exercising his powers and authority. *City of New York v. State of New York,* 40 N.Y.2d 659, 667, 389 N.Y.S.2d 332, 357 N.E.2d 988, 994 (N.Y.1976) (citations omitted); *see also McCall v. Barrios–Paoli,* 93 N.Y.2d 99, 688 N.Y.S.2d 107, 710 N.E.2d 671 (N.Y.1999) (confirming the legal proposition that the State Constitution establishing the Comptroller was not intended to limited his function but rather to protect the independent character of the Comptroller's core audit functions); N.Y. STATE FIN. LAW § 8 (listing the general duties of the Comptroller).

█ For reasons of federalism and comity, we give great deference to the State and its Legislature to define how governmental entities are to be separate and distinct and how they may relate to one another as a whole; this is "uniquely an exercise in state sovereignty." *Lyes v. City of Riviera Beach, Fla.,* 166 F.3d 1332, 1343–44 (11th Cir.1999) (internal quotation marks and citations omitted). Therefore, there is a presumption that separate governmental agencies under state law will not be aggregated together, without the showing of. much more. *Id.* at 1335 (ruling that it would not lump two agencies together for Title VII purposes). We thus accept the proposition that DOT and OSC are not interrelated agencies, do not have a similar mission, and are situated at different spectrums of New York State governance as established by the constitution and legislation. They have no overlapping goals or missions and do not have the ability to share or control the other agency's agenda, documents or personnel.

█ These governmental entities, as well as all others, do not have either the inherent

---

**6.** The Legislature reinforced the Comptroller's autonomy by giving her the ability to determine her staff and delegate specific responsibilities independent of the governor's appointment prerogatives. N.Y. EXEC. LAW § 41.

or common-law right to sue. The right to sue is derived from the relevant enabling legislation or some other concrete statutory predicate or the reasonable inference thereof:

> With respect to the capacity question, we stated that the authority of a government agency to bring suit does not require "that in every instance there be express legislative authority." *[Matter of City of New York v. City Civ. Serv. Commn.,]* 60 N.Y.2d 436, 444–45, 470 N.Y.S.2d 113, 458 N.E.2d 354 (1983). Rather, the capacity to sue may also be inferred as a "necessary implication from [the agency's] power[s] and responsibilit[ies]," provided, of course, that "there is no clear legislative intent negating review" (*id.,* at 443, 444, 470 N.Y.S.2d 113, 458 N.E.2d 354). The Court indicated in *City of New York* that the power to bring a particular claim may be inferred when the agency in question has "functional responsibility within the zone of interest to be protected" (*id.,* at 445, 470 N.Y.S.2d 113, 458 N.E.2d 354 distinguishing *Matter of Pooler v. Public Serv. Commn., supra).*

*Community Bd. 7 of Borough of Manhattan v. Schaffer,* 84 N.Y.2d 148, 156, 615 N.Y.S.2d 644, 639 N.E.2d 1, 4 (N.Y.1994) (quotations and alterations in original).

■ Although New York's general statutory scheme is for the Attorney General to prosecute lawsuits, the only limitations on an agency commencing a lawsuit are that the agency must put the Attorney General on notice so that they can participate in the litigation and that the case has to be prosecuted in the name of the State of New York. N.Y. EXEC. LAW § 63;[7] N.Y.C.P.L.R. § 1301 (1962) ("An action brought on behalf of the

people ... shall be in the name of the state").[8] By virtue of N.Y.C.P.L.R. § 1301, the People of the State of New York are only nominally the plaintiff or defendant in a civil proceeding and the true actors for any litigation are the agencies functioning within their "zone of interest" and authority. And to the extent that the Attorney General does prosecute or defend a civil action, his respective client at that moment is the agency who has the authority to protect or defend its constitutional and statutory mandates.

■ Herein, DOT, who entered into a contract with Amtrak on behalf of the People of the State of New York, with the assistance of the Attorney General, has the authority to bring a cause of action for breach of a contract. *People of the State of New York v. Greylock Const. Co.,* 213 A.D. 21, 209 N.Y.S. 735 (N.Y.App.Div. 4th Dep't), *aff'd,* 240 N.Y. 710, 148 N.E. 769 (1925) (recognizing generally that the State can bring a lawsuit for breach of a highway contract). Conversely, the Comptroller would not be in a similar position to bring this very same action because such activism would be outside its constitutional and statutory purview. Thus, OSC and the Comptroller are not a party to this action, and, under this status, Rule 34 may not be applicable.

**B. Complaining Agency Access to Documents of Another Agency**

■ Based upon court precedent from the Southern District of New York, Amtrak raises the assertion that when a governmental agency is a plaintiff, it may be required to produce the documents of another agency. *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16 (S.D.N.Y.1984). Ex-

---

**7.** The relevant portions of the statute reads as follows:

> [The Attorney General shall] [p]rosecute and defend all actions and proceedings in which the state is interested .... No action or proceeding affecting the property or interests of the state shall be instituted, defended or conducted by any department, bureau, board, council, officer, agency or instrumentality of the state, without a notice to the attorney-general apprising him of the said action or proceeding, the nature and purpose thereof, so

> that he may participate or join therein if in his opinion the interests of the state so warrant. N.Y. EXEC. LAW § 63(1) (emphasis added).

**8.** Read together with Executive Law § 63(1), the general aspirate principle when agency litigation is contemplated is that "[t]he 'state' is to be the named party in a civil action or proceeding brought on behalf of the people [and][t]he Attorney General is the state official who prosecutes such actions and proceedings." N.Y.C.P.L.R. § 1301 Commentary (alteration in original); *see supra* n. 7.

pounding further, the district court articulated that

> [w]hen an agency of government institutes suit, any obligation to disclose relevant information extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff .... If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit.

*Phillips Petroleum Co.*, 105 F.R.D. at 35 (quoting *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D.Mass.1979) (citations omitted)).

*Phillips Petroleum's* pronouncement, in our view, is much too broad and sweeping for us to fully adopt in this case. Admittedly, we find it toilsome to reconcile *Phillips Petroleum* with the precedents we have already embraced in determining what agency is the party in this action. *See supra* part II.A. If we were to endorse *Phillips Petroleum's* proposition of the law, it would lead invariably to illogical consequences. Following *Phillips Petroleum's* and Amtrak's argument to its logical conclusion, any lawsuit brought by the State of New York would subject all twenty-two executive agencies, the legislature, the judiciary, quasi-state agencies, and possibly public authorities to disclosure scrutiny, notwithstanding their relative remoteness to the issue of the case. Not only would such a discovery mandate be unduly burdensome and cumbersome but totally untenable and outside the spirit of the Federal Rules. How would one agency know what another possess without a blanket inquiry of all that constitutes New York State governance. Such an encumbrance can only precipitate absurd results. Furthermore, considering that OSC conducts hundreds of audits annually of both state and local governmental agencies, it would be preposterous to expect OSC to be a party to every governmental lawsuit by virtue of performing an audit.

Much more than auditing records must be required.

We do note, however, that *Phillips* and *Ghana Supply Comm'n* may be distinguishable from our lawsuit for one critical yet overlooked fact—"control." In *Phillips*, it was the French Government, who owned 85% of the plaintiff therein, that instigated the lawsuit, and those separate governmental agencies, Ministry of Economic, Finance and Sea, who were subjugated to the discovery demand, were found to be the "moving force" and integrally involved in the substantial terms of the disputed contract. *Phillips Petroleum Co.*, 105 F.R.D. at 34–35. The key factor is embedded in the nature of the relationship between the plaintiff therein and all of France's ministries, which exhibited the factor of control over some aspect of the plaintiff's dealings. Likewise, though more difficult to distinguish, in *Ghana Supply Comm'n,* the court found that the Republic of Ghana initiated the lawsuit through a Ghana-controlled corporation and therefore was subject to Massachusetts disclosure laws. *Ghana Supply Comm'n,* 83 F.R.D. at 590–91.

For the reasons acknowledged above, we have accepted the legal premise that state agencies for most purposes are separate and distinct and are not viewed in the aggregate. *Strauss v. N.Y.S. Dep't of Ed.*, 26 A.D.2d 67, 805 N.Y.S.2d 704 (3d Dep't Dec. 15, 2005) (citing *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d at 1335) (further finding the State Education Department and the Department of Labor are "horizontally situated" with separate establishing legislation and discrete responsibilities and could not be regarded in the context of a parent/subsidiary corporate model); *Allen v. Brown,* 1998 WL 214418, at *3 (N.D.N.Y. Apr.28, 1998) (denying a request for injunctive relief against a state agency and correctional facility because they were not a party to the action); *A'gard v. Girdich et. al,* Case No. 9:03–CV–670, Order, dated July 20, 2005 (N.D.N.Y.) (Lowe, M.J.) (finding Department of Correctional Services (DOCS) and Office of Mental Health (OMH) as "separate and discrete organs of New York state government which serves different purposes, [and] acts under differently authority," and that DOCS could not be com-

pelled to produce documents in the possession of OMH). The marrow of these precedents, as mentioned earlier, is the element of control. The determination of control is often fact specific and thus generalizations, as *Phillips Petroleum's* pronouncement seems to have done, are difficult to apply across the board. 7 James Wm. Moore et al., Moore's Federal Practice § 34.14[2][c] (3d ed.2005). Thus, distinctions notwithstanding, to the extent that *Phillips Petroleum* and *Lyes* cannot be reconciled, we decline to follow *Phillips Petroleum* literally.

### C. Control of Another Agency's Documents.

 The State stakes out an erroneous assumption that the only way Amtrak may secure OSC documents, besides a subpoena, is to make OSC a party. Dkt. Nos. 24 & 26. Rule 34 is rather clear that where documents are in the "possession, custody, or control of a party," they must be produced. Fed. R. Civ. P. 34(a)(1). This Rule has been extended to documents that may be in the possession of a third party. *United States v. Freidus*, 1989 WL 140254, at *2–3 (S.D.N.Y. Nov. 13, 1989) (party husband compelled to produce documents held by his nonparty wife);[9] *see also* 7 Moore's Federal Practice § 34.14. Amtrak extrapolates upon the legal notion that governmental agencies are "akin to divisions of a corporation" and because of this symbiosis "a governmental agency has the practical ability to obtain—and therefore controls—documents held by sister agencies." Dkt. No. 25 at p. 25. To support this postulation, Amtrak relies upon several precedents that do not specifically refer to the purported relationship between governmen-

tal agencies but corporate infrastructures instead. *Hunter Douglas, Inc. v. Comfortex Corp.*, 1999 WL 14007, at * 3 (S.D.N.Y. Jan. 11, 1999) ("In determining whether a corporation ... can be compelled to produce documents held by a[n] ... affiliate, this court must first consider the nature of the relationship between the corporation and its affiliate.") (citations omitted); *see also Ssangyong Corp. v. Vida Shoes Int'l Inc.*, 2004 WL 1125659, at *4 (S.D.N.Y. May 20, 2004) (citing *Hunter Douglas v. Comfortex*); *DeSmeth v. Samsung Am., Inc.*, 1998 WL 74297, at *9–10 (S.D.N.Y. Feb. 20, 1998). Yet, *Lyes* cogently challenges the belief that state agencies are the same as corporate/subsidiary entities: "States are not the equivalent of corporations or companies, and local government bodies are not the same as subsidiaries." *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d at 1342; *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 n. 10 (5th Cir.1983) (noting that "where state or local governmental entities are involved, any indicia of integration must be considered in a framework that is sensitive to the differences between governmental subdivisions and private entities"); *Massey v. Emergency Assistance, Inc.*, 724 F.2d 690, 692 (8th Cir.1984) (citing *Trevino v. Celanese Corp.*); *see also Sandoval v. City of Boulder, Colorado*, 388 F.3d 1312, 1323 n. 3 (10th Cir.2004). Therefore, neither the infrastructure nor affiliation is a determinative factor as to whether Rule 34 may be extended to other document holders who are not parties to the litigation, but it is the indispensable element of control that is conclusive.

---

9. *United States v. Freidus* further states that [c]ontrol may be determined by the ability of the party to obtain the documents in question. *Scott v. Arex*, 124 F.R.D. 39, 41 (D.Conn.1989) ("a party controls the documents that it has the right, authority, or ability to obtain upon demand"). Neither the ownership of the documents, nor the location of the documents are determinative. *See Cooper Indus., Inc. v. British Aerospace*, 102 F.R.D. 918 (S.D.N.Y.1984) (defendant required to produce documents possessed by defendant's affiliate); *M.L.C., Inc. v. No. Am. Philips Corp*, 109 F.R.D. 134, 138 (S.D.N.Y.1986) (similar). A party may be required to produce documents even if it only controls the persons who are able to obtain the documents. *See Herbst v. Able*, 63 F.R.D. 135, 138 (S.D.N.Y.1972). "Books and records relating to the business of the party called on to produce them are assumed to be in the party's possession or control ...." 4A *Moore's Federal Practice* ¶ 34.17 (2d ed.1988). Furthermore, a defendant cannot evade production of documents by conveniently claiming a lack of access when the documents are sought for discovery purposes. *See Cooper Indus., Inc.*, 102 F.R.D. at 919–20 ("it is inconceivable that defendant would not have access to these documents and the ability to obtain them for its usual business"). 1989 WL 140254, at *2–3.

■ The term control in the context of discovery is to be broadly construed. *M.L.C. v. North Am. Philips Corp.*, 109 F.R.D. 134, 136 (S.D.N.Y.1986) (citing *Herbst v. Able*, 63 F.R.D. 135 (S.D.N.Y.1972)). The critical inquiry is whether the party-litigant can exercise custody and control over the documents. *Hunter Douglas, Inc. v. Comfortex Corp.*, 1999 WL 14007, at *3. The rubric of this query is not limited to whether the party has a legal right to those documents but rather that there is "access to the documents" and "ability to obtain the documents." *Id.* at *3 (citing *Cooper Indus., Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 (S.D.N.Y. 1984) & *Addamax Corp. v. Open Software Found., Inc.*, 148 F.R.D. 462, 467 (D.Mass. 1993)); *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146 (S.D.N.Y.1997) (finding that "documents are considered to be under a party's control when the party has the right, authority, or **practical ability** to obtain the documents from a non-party to the action") (emphasis added); *M.L.C. v. North Am. Philips Corp.*, 109 F.R.D. at 136 (discussing the legal right to the production of the document).[10]

■ The burden of establishing control over the documents being sought rests with the demanding party. *DeSmeth v. Samsung Am., Inc.*, 1998 WL 74297, at *9; 7 MOORE'S FEDERAL PRACTICE § 34.14[2][b]. Amtrak's contention that DOT has possession, custody, and control of OSC's records is supported by nothing more than hypotheses. The State has explicitly stated that DOT does not have access or control over OSC records (the documents that reflect the underlying facts and conclusions of certain audits) other than those records or reports OSC has given to DOT, which were the final reports on the audits of Super Steel, DOT, and Amtrak. DOT does not have the legal right nor the practical ability to those underlying documents. DOT did not generate, acquire or maintain the materials nor determine the location thereof. The audits have nothing to do with the contract between DOT and Amtrak, the transaction at issue in this litigation, and OSC will not receive any benefit of any award in this case. *See supra* n. 10. Thus, Amtrak has not and cannot meet its burden of proving control.[11]

## D. Deliberative Process Privilege

Amtrak is not without a possible mechanism to assess the records they seek. First, DOT has stated repeatedly that it will share with Amtrak those final OSC reports that are in their possession, if they have not done so already. In fact, Amtrak already has OSC's final reports of the audit of itself and Super Steel. Dkt. No. 23, Ex. C. Further, Amtrak is not entirely without recourse in obtaining the underlying papers, facts, conclusions of OSC in conducting the audits of DOT, Super Steel, and Amtrak. They may possibly avail themselves of the power of a subpoena. FED. R. CIV. P. 45. Amtrak will not be any more bedeviled by pursuing these documents by a subpoena and the Court is not persuaded that Amtrak will endure greater prejudice or is without a remedy to compel OSC if it fails to respect or respond to a subpoena.

However, should Amtrak serve a subpoena upon OSC for these documents, it may be confronted, and thus stymied, by OSC invok-

---

10. Legal treatises have elaborated on an array of factors in determining whether a party is in possession of documents in order to comply with Rule 34:(1) the use or purpose to which the materials were employed; (2) whether the materials were generated, acquired, or maintained with the party's assets; (3) whether the party actually generated, acquired, or maintained the materials' use, location, possession, or access; (4) who actually had access to and use of the materials; (5) the extent to which the materials serve the party's interests; (6) any formal or informal evidence of a transfer of ownership or title; (7) the ability of the party to the action to obtain the documents when it wants them; (8) whether and to what degree the nonparty will receive the benefits of any award in the case; and (9) the nonparty's connection to the transaction at issue. 7 MOORE'S FEDERAL PRACTICE §§ 34.14[2][b] & [c][2].

11. Amtrak could possibly argue that the State did not aver to their position that DOT neither has control nor access to OSC's documents. Such averments are unnecessary because this Court has a personal advantage to the veracity of the State's assertion. The undersigned previously served as General Counsel to OSC and has personal knowledge to the fact that neither DOT nor the Attorney General have access to OSC's documents without OSC's permission or the employment of a subpoena.

ing the Deliberative Process Privilege. Again, to reiterate, Amtrak is not seeking the final reports, but all of the backup information and data, opinions, impressions, and deliberation that led to the ultimate conclusions articulated in the final audit reports. It is the search for this underlying information that caused this Court to raise, *sua sponte*, that OSC records may be cloaked with this privilege.

*LNC Investment Inc. v. Republic of Nicaragua* aptly summarizes the expansive law on Deliberative Process Privilege:

> The deliberative process privilege protects the decisionmaking processes of the executive branch of the government from discovery in civil actions. *See Hopkins v. U.S. Dep't of Hous. and Urban Dev.*, 929 F.2d 81, 84 (2d Cir.1991); *Ernest and Mary Hayward Weir Found. v. United States*, 508 F.2d 894, 895 n. 2 (2d Cir.1974); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb. Inc.*, 125 F.R.D. 51, 53 (S.D.N.Y.1989). The doctrine arises under common law and the Freedom of Information Act, Exemption Five, 5 U.S.C. § 552(b)(5). *See* William M. Cohen, American Law Institute, The Deliberative Process Procedure 337 (1997). The privilege applies to documents and discussions that are predecisional and deliberative in nature. *See Local 3, Int'l Bhd. of Elec. Workers, AFL–CIO*, 845 F.2d 1177, 1180 (2d Cir.1988) ("Local 3"). Information is "predecisional" if it "precedes, in temporal sequence, the decision to which it relates," *Hopkins*, 929 F.2d at 84, rather than a "postdecisional memoranda setting forth the reason for an agency decision already made." *A. Michael's Piano v. F.T.C.*, 18 F.3d 138, 147 (2d Cir.1994). A "deliberative" document is "related to processes by which policies are formulated." *Hopkins*, 929 F.2d at 84. Courts have been particularly protective of draft documents because they are inherently deliberative in nature. *See Lead Industries Assoc. v. OSHA*, 610 F.2d 70, 86 (2d Cir. 1979). Documents that are exempt from discovery in civil actions include: advisory opinions, recommendations, and communications relating to policy formulations.

*See Hopkins*, 929 F.2d at 84; *Grossman v. Schwarz*, 125 F.R.D. 376, 381 (S.D.N.Y. 1989). Subjective documents which "reflect the personal opinion of the writer, rather than the policy of the agency" are considered privileged information because they are predecisional. *Lee v. Federal Deposit Insurance Corp.*, 923 F.Supp. 451, 456 (S.D.N.Y.1996)(quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980)). Generally, documents that are factual in nature do not qualify as privileged. Whenever possible, facts that are separable from the privileged portion of a document should be disclosed. *See Hopkins*, 929 F.2d at 85 (quoting *Founding Church of Scientology v. Nat'l Security Agency*, 610 F.2d 824, 830 (D.C.Cir.1979)). Where facts are intricately intertwined with privileged information, the agency seeking protection from disclosure has the burden of establishing the necessity of keeping the factual information undisclosed in order to protect the privileged information. *Id.* The purpose of the deliberative process privilege is to encourage a free exchange of ideas among governmental officials in order to "safeguard the quality and integrity of government decisions." *Hopkins*, 929 F.2d at 84.

1997 WL 729106, at *1–2 (S.D.N.Y., Nov.21, 1997) (Ellis, M.J.); *see generally Grand Central Partnership v. Cuomo*, 166 F.3d 473, 482 (2d Cir.1999); *Reino De Espana v. Am. Bureau Shipping*, 2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005).

Amtrak correctly points out that any discussion of this Privilege as it may relate to this case would be premature. If OSC is served with a subpoena and intends on raising the Deliberative Process Privilege in response to the subpoena, it must first follow certain procedural steps and then the Court would have to engage in a balancing test between the public interest in disclosing the documents and the government's interest in protecting them. *See generally LNC Investments v. Republic of Nicaragua*, 1997 WL 729106, at *2.[12] Hence, we will not, at this juncture address this privilege.

**12.** Succinctly those procedural steps are

the claim of privilege must be asserted by the

## III. CONCLUSION

To summarize, the party to this action is DOT and the State of New York is just a nominal party. Further, OSC is not a party to this action. In order for Amtrak to compel DOT to produce OSC's record, it must show that DOT has such records in its possession, custody, and control, which it failed to do. If Amtrak seeks these documents, it will have to resort to Rule 45 and issue a subpoena upon OSC to compel the production of those records. Any application of the Deliberative Process Privilege to the facts in this litigation is premature but the party should be guided by the discussion above.[13]

Accordingly, Amtrak's application to compel disclosure of OSC's record is **DENIED**.

IT IS SO ORDERED.

head of the governmental agency which has control over the information to be protected, after personal review of the documents in question; ... Alternatively, the head of the agency may designate a subordinate in high authority who is competent to assess the confidential nature of the agency's documents; the information or documents sought to be shielded must be identified and described; the agency must provide "precise and certain" reasons for asserting confidentiality over the requested information ... insur[ing] that the documents sought to be protected were [ ] (1) part of the deliberative process by which policies or decisions are formulated [ ] and (2) truly of a predecisional, or advisory or recommendatory nature, or expresses an opinion on a legal or policy matter, or otherwise were reflective of a deliberative process.
*LNC Investments v. Republic of Nicaragua,* 1997 WL 729106, at *2 (citations and punctuation omitted).

13. Such an analysis would also be premature as to Amtrak's proffer that OSC has waived the Deliberative Process Privilege.